Court is in session. Our next case for today is 2019-20140 Fulton v. United Airlines. Ms. Livingston. Dana Livingston for the defendants appellants United Airlines and AirServe Corporation. In this personal injury case a writing arising out of the claim that the plaintiff was dropped while being transferred from her seat aboard a United Airlines flight, a sizable judgment was entered. Just one second. We're getting either feedback or some discussions elsewhere so if you're not speaking and please put yourself on Let's try again. You may proceed. May it please the court. In this personal injury case arising out of the claim that the plaintiff was dropped while being transferred from a chair into her seat aboard a United Airlines flight, a sizable judgment was entered. The bulk of that $3.8 million judgment, in fact, 94% of it is for non economic damages. I'm going to try to cover in the short time two issues. The first is whether the evidence of medical causation is legally sufficient and second whether the non economic economic damages are grossly excessive. Leaving to the brief other issues including which exhibits actually went to the jury unless the court has questions about those other issues. I'd like to go ahead and start with the medical causation issue. The plaintiff has a couple of problems here. The first one is that Fulton has a complicated and a pretty significant profile of pre existing conditions. That raises the very question that I want somebody to tell me about based on what the record shows. What is past disfigurement in this record? What is it and what's the evidence? Um, there was no. Normally it is something that mars the physical beauty. Um, there was a definition supplied to the jury in the jury charge is in response to jury note number two. It's in our record excerpts. Um, it's something that impairs the beauty or the symmetry, um, uh, of a physical appearance. Um, here there actually wasn't any testimony about that. Normally it's evidence of scarring or something like that. There was not actually a testimony about scarring other than Fulton's testimony that she had a significant scar from her cervical fusion surgery that was four years prior to this United Airlines flight. Are there any pictures in the record? There are not photos in the record except of her arthroscopic surgery. Um, those air at the tail end of the plaintiff's exhibits. But those are taken inside the shoulder. And so, um, under Texas's approach to disfigurement, um, they're not going, they shouldn't count. And it's not the way the jury was charged, um, under the definition of disfigurement. And you want to talk about preexisting medical. Is that right? That's correct. So we've got a, you know, several challenges for the medical causation evidence. One is this significant profile of preexisting conditions that, um, involves a lot of very painful conditions. Wasn't the jury charged on that, though? The jury was not. Um, the PJC talks about, um, an option to charge the jury about preexisting conditions or been asked to charge the jury on that. It was not. The PJC guidance actually says that if the negligence question itself uses the word injury instead of occurrence, that it recommends that those extra instructions not be given. And so neither cyber free to argue that at the closing argument, though. Correct. That's correct. That's correct. So So the problem really comes when we move over to Texas case law that talks about the character of evidence is required for medical causation. Um, and under this court's decision in Hamburger, we do look to Texas law about what that Um, and the Texas Supreme Court's been pretty clear that medical expert testimony is required if the causation is beyond the common knowledge or experience of laypersons. And that usually occurs when you have a plaintiff with preexisting conditions that have some relevance to the damages that are being sought or sought to be recovered in a particular case. Um, so that's when you end up with the Guevara case and the Jelinek case of the Texas Supreme Court. Didn't Miss Fulton's doctor, Dr Watson. Um, I presume. Um, didn't he testify that the injury was the result of trauma? It was the result of of trauma and not a degenerative injury wasn't the result of a existing condition. Um, so he didn't tackle head on a lot of her preexisting conditions. Um, and so there are two responses to your question. One is that, um, some of his testimony is based on Fulton's own narrative. Um, the other part of his testimony is at the end is that he tackles only whether it's a some sort of acute injury. And so what what he doesn't know what he admits that he doesn't know is whether this was some blunt force trauma of some other acute injury. Um, and he certainly doesn't know when that might have happened. Um, what record evidence is there that suggests that it was her preexisting condition that was the cause of what she suffered? So this is this is the other answer to your question is, you know, we can have a preexisting her preexisting conditions might not hypothetically cause under Watson's Dr Watson's view of it, right? Might not have caused the rotator cuff injury, but they have a significant relationship to the damages that she saw, which are the pain, physical pain and mental anguish because she was already on round the clock prescription narcotic care for her various and serious, you know, debilitating conditions that are listed in our brief and they're in the record. Um, you know, one of the other problems with Dr Watson is, you know, they never designated him as a retained expert and they never did disclosures for him as a non retained expert. Um, so they've got kind of this post hoc ergo proctor hoc problem of Fulton's own on her recollect her recounting of events as part of his analysis. Um, and then they're left without somebody who can testify about causation. But if you sort of set aside, you know, the non retained expert issues, you know, Watson himself admits he can't say what caused it or when it was caused because of the passage of time. And he never goes in and robots really, um, what our expert had said, which was that, um, that seven months after the injury, when you look at those arthroscopic photos, which is what Watson's relying on is what he sees inside the when he does the surgery, that a blunt force trauma injury or an acute injury and a degenerative injury would actually look the same that many months out. Um, I wanted to see if I could go ahead and shift gears a little bit and talk about excessiveness. Um, so, you know, I think about excessiveness. I'm mindful of Judge Rubin's admonition and called the rare that, you know, the sky can't be the objective framework to analyze the excessiveness of damages. Um, the plaintiff has spent some effort in her brief to, uh, invoke what I would call the unique facts exception to the maximum recovery rule. So I wanted to talk a little bit about the test for selecting analogous or benchmark cases for use as that objective frame of reference. The test under the maximum cover rule for these benchmarks. It's not absolute identity. It's factual similarity. Um, and so the plaintiff's unique facts exception argument appears to hinge on the presence of a bicep tear. Um, the problem is that a couple things. The first is that her own treating physician, Dr Watson, said that a bicep tear is common with a rotator cuff tear. And so the absence of the mention of a bicep tear in a particular opinion that might otherwise serve as a benchmark. I don't think the absence of the mention of a bicep tear is a reliable basis to exclude a case as a benchmark. You know, I think the other thing is, that's where that the case that's addressed in the 28 J letter, the Eschewary versus Jazz Casino case is helpful. Um, in that case, this court identified three case comparators that it said met the factual similarity test. And, um, if you compare those cases and the facts about the injuries in those cases with the injury in the Eschewary case itself, you'll notice some differences. Nevertheless, the court said they are similar enough to be used as benchmarks, and it sends it back to the district court, um, with instructions to use those cases as guideposts. Um, and, you know, the plaintiff in that case actually raised the unique facts exception. It's not mentioned in the opinion, but it gets implicitly implicitly rejected. I mean, I think the lesson there is, you know, every case is going to be unique on some facts that we ought not get too granular. Um, the flip side, I think, of the search for benchmark cases is to not go too far afield of the injury and cast the net too broadly in trying to select a benchmark. And I think that's where Fulton's brief goes astray a little bit when it dips into these nursing home cases and other health care liability cases around page 43 of her brief. You know, in that of cases, none of those that she identifies actually involved a shoulder injury. I guess the purported similarity was that, you know, there was a negligent injury to someone who had a frailty. Um, but, you know, so often happens in these nursing home cases and other health care liability cases. Um, these elderly or disabled claimants, the facts in those cases leading to the injury actually involved quite inflammatory facts. The other problem is I'm not entirely sure that the plaintiff wants to go there on those cases because the Texas Legislature has put caps down on health care liability claims. Um, they did it in the late seventies and 45 90 I and then revamped him in 2013 as part of House Bill four. And these days for a live plaintiff filing a health care liability claim, the cap on all non economic damages $250,000. I mean, that's the public policy in the state of Texas about the limits of those. So, you know, I think it's a little bit of a risky gambit. Um, not just because of the caps, but potentially it's admissions, large, non economic damages in this case, like so many of those mad mouth cases may have been the product of inflamed passions. You know, we end up, I think, with a little bit of a Goldilocks principle for the maximum recovery rule selection of cases, right? Not too hot, not too cold. Just right. Avoiding the extremes and trying to find the common ground in selecting the benchmarks. I want to spend last couple minutes here talking in particular about some of the getting down into the weeds a little bit on some of the cases that both sides have cited. I think the primary factor in nature of the injury is a rotator cuff tear or shoulder injury. We've cited some of those cases in our opening brief page 39 to 40. Um, the plaintiff has cited an intentional injury case that did not involve a shoulder injury at all. It was a traumatic brain injury case. That's their causes case page 41 of the brief at note six. Um, and that is not an appropriate benchmark. The case is just quite different. Um, you know, and it was stepped back just a little bit and we think about the maximum recovery rule and some of the purposes for it. You know, I think in the old days we should think in valuing cases for purposes of settlement, um, and just advising a client, you know, we do sort of a three times medicals formula. Um, if the facts were really extreme or the plaintiff was extremely sympathetic, maybe maybe a five times. But here, if we just assume that what the jury awarded in past medicals is, um, is the right number, we're way over 30 times that amount. Um, so I just think it's beyond the typical multipliers and we end up, um, being too far afield for the purposes of this court's maximum recovery rule jurisprudence. Counsel, is it appropriate for the jury to have taken into account though, the fact that she had to sit with this injury so long, um, on the plane, uh, with no one noticing that she had been injured. Right. That, and that it contributed to in the fact that she has, she's always going to have pain. So both for the past and the future. Certainly. Um, we're not suggesting that her, um, in our excessiveness challenge, we're not suggesting that her damage award be zeroed out. And we have not challenged as a standalone challenge, the handsome award of physical impairment, which goes to your, the part of your question, Judge Elrod about that she will never be a hundred percent. Um, even for the physical pain and mental anguish award, we're not suggesting that be zeroed out. We're suggesting that we use objective benchmarks to consistent with this court's maximum recovery rule jurisprudence to, um, guide the district court on a remittiture of that amount to bring it within, um, an appropriate range. Um, and you know, the flight itself was, was 25 minutes. Um, your point is, is we'll take it now or the issues about how long it took her to get some care afterwards and, um, search for surgeons and stuff. I think then we start to get a little far afield because there's certainly no tort for failure to settle a personal injury claim. This is not a worker's comp case. It's not a bad faith failure to settle a first party claim. Um, okay, thank you. I think you've answered my question and your time is expired. Thank you very much. We'll hear from Miss Nicholson. My name is Penny Nicholson and I'm here today representing the affilee, Erika Fulton. Um, I want to answer some of the questions that, um, the panel has already presented in terms of past disfigurement. Um, the evidence was there were some small poke holes at, related to the surgery and also there was bruising and swelling and the record site for the bruising and swelling is, um, uh, ROA, uh, 0.1154. Uh, then, uh, I also like to briefly address, um, uh, Judge Willits point. Do you think that, I mean, that's not let's, it's, if we're frank with one another, that's rather thin for past, past disfigurement, isn't it? Well, uh, we've cited some case, a case in, um, our brief where, uh, $25,000 was awarded for scarring. Uh, the scarring I think may have been more around $50,000. Uh, but the past disfigurement is not our primary focus. Um, and, uh, uh, but to Judge Willits point about, didn't the, uh, treating physician testify as to causation? That is exactly right. He did. Um, that's in our first record excerpt and, uh, the record on appeal number 1331. And he testified very plainly that in, um, reasonable medical probability, the accident as Ms. Bolton had described it was the cause of her rotator cuff injury. Um, and the law in both Texas and the circuit is that, uh, treating physicians are allowed to testify as to causation. And that that's what he did. The law is also that, um, that treating physician is entitled to rely on the history as provided to him by his patient and, um, based on her medical records. So Dr Watson was completely confident to provide that given the clear nature of that testimony. Um, in the reply brief, the appellant said, well, that's just Ipsy Dixit. But that's not true either because he went on for pages and pages describing why he concluded that, um, the rotator, uh, torn rotator cuff was, uh, caused by the trauma that resulted from her being dropped. And that's a lot of that. Is there any evidence? Is there any record evidence showing that your client, Ms. Bolton, had any shoulder issues before this incident on the plane? No, there was no evidence of, um, um, any shoulder injuries. Uh, Dr Watson specifically testified to that. And, um, uh, so there was no evidence of that nature. Anything beyond Dr. Watson's testimony that, that kind of shows causation between the fall and the torn rotator cuff beyond his testimony? What else is in the record to amplify that? Well, um, we are mainly that's the testimony we're mainly relying on and, uh, it's in record excerpt two and also pages, uh, 1309 through 1331 of the record. But I will note that when he was explaining, he said that there's two basic kinds of rotator cuff tears and one is caused by trauma and one is caused by, um, degeneration. And, uh, a rotator cuff tear that's caused by degeneration is characterized by fraying and it's very thin when you look at it. Um, a rotator cuff tear that's caused by trauma is, um, when you look at it, the rotator cuff still has its full thickness, but there is a hole or a tear that goes all the way through the full thickness of And then, and so he said, uh, one of his primary reasons for, uh, concluding that the, um, being dropped caused her, uh, rotator cuff tear was when he did the surgery, he looked inside her and he could actually see that there was a hole there that went all the way through the rotator cuff and he did not see evidence of degeneration. And, um, when you're saying other evidence, uh, their expert, Dr, um, let's see, Elia, um, had to admit that, um, there was a full thickness rotator cuff tear. And what that meant is, uh, the doctor that had been relying on Dr Finkel, he's not an expert. He's someone she saw. He thought, well, you know, I think this is just caused by, um, radiating pain from her, her shoulders. I don't think she needs surgery. Um, and I think it's coming from her neck. Uh, well, contrary to what, um, the appellant said in your brief, uh, Dr Watson did consider that he and pages 1401, 1402 of the record. Um, he says, you know, I saw, I, um, saw they had concerns about does this come from the neck? And, um, he looked at that, but he disagreed with their opinion. And, um, so another piece of evidence that kind of supports the causation is that one of the other things that Dr Finkel had said was that, um, um, surgery is not going to do her any good. She's not going to feel any better after the surgery. It's radiating from her spine, radiating from her neck. But what happened was that after the surgery, she, she'd been in excruciating pain for seven months before the surgery. And she began to get better in terms of her pain after the surgery. So there you can see also is evidence of causation. Um, and she didn't get all the way better. She still has pain. She still has limitations, but for the first time she had some relief. Uh, the, um, so that's primarily, um, the, the key evidence that we're relying on in terms of causation. Uh, let's see. Um, turning to testimony that she had full use of her arms before the accident and that she had no pain the day before the till after that's not necessarily a hostile question, but is it is the evidence in the record from Miss Fulton and her caretaker that she had full use before this accident, but not, not full use after the accident. Is that? Yes. Oh, yes, that's definitely. Yeah. Because her arms were in good shape. She had to use because she was confined to a wheelchair. She had to use her arms. And that's one of the reasons why this case is so different from other cases. When you have a rotator cuff tear for an able bodied person or a person, even just a person who had the use of their other three limbs, it would not be anywhere near as traumatic an injury. Um, but for her, it, she basically lost the use of three limbs and was only left with one. And that was her non dominant arm. So she lost her mobility, she lost her independence. And it was a way worse injury than it would be like in the typical rotator cuff cases that the appellant site, it's just not comparable. They're nothing alike. She's a much worse situation than those people are. Actually, in terms of comparable cases and the injury, we don't think there are any analogous cases in this court. And we do in and we do think this case falls within the uniqueness exception. But we think that the most analogous case is actually the the rehabilitation hospital of Austin versus Cooper case. Now that is a case about from a nursing home, but the woman was injured when she was being moved from her bed to a wheelchair. And the injury was she had to have she got two broken legs in that. And so there is a different nature of the injury in that sense. But both plaintiffs suffered excruciating pain. And in addition to that, they were both people who had very And, but, and in the Cooper case, the appellants had suggested luck and light of this woman's limited mobility. Come on, give me a break. $1.25 million is way too much. And and that would be adjusted to with inflation today, about $2 million. And the court came back and said, No, that's not right. You know, what you did to this woman is you took away what little what little hope and independence she had. And the small things that she enjoyed that if someone else had them taken away, it wouldn't be that big a deal. But for this plaintiff, it is a big deal. And that's really the same kind of situation that Miss Fulton is in. And we're not saying it's exactly analogous, but we think it's the most analogous because I mean, it's just not the same thing. These the cases that are cited with rotator cuff tears, and the maximum recovery rule provides that, you know, the recovery is limited to 150% of the highest comparable case, but they're just not a comparable case here. In fact, I say that if the uniqueness exception doesn't apply here, it wouldn't, it doesn't really exist. I mean, this really is different from other cases. And so and there are cases, it's true that as the appellants have pointed out that most of the time there are analogous cases, but there isn't here. And there are cases that have applied the uniqueness exception, the Vogler case that we cited. And then also there is a case, the Lermont versus Sears Roebuck case, which is 631 F3rd 724. It's a case from the Fifth Circuit from 2011. What they looked at in these cases seems to be a constellation of injuries and whether there's comparable cases involving the constellation. And we submit that in this case, that they're not comparable. There's no comparable cases. When these arguments were presented to Judge Hittner, and I know that they were in part of a new trial and a remititure and all kinds of things that were filed before him. Did he, I know he ruled on the on those motions in an order, but did he address them in a, in a hearing or something where he thought was comparable or why he did what he did? I just, I shouldn't know that. And I just don't. I don't believe that he did. I think that his written orders were in body. And I'm not saying that that's insufficient in any way. I'm just wondering because obviously he's a very experienced, both Texas and New Jersey. The other thing about the mention of passion and prejudice is I don't think that that's where this jury was going at all. And the basis for that is all these notes that they sent out. I think that this was a very conscientious jury before they, the deliberations had barely started when they said, oh, there's some typos here. And about, I think it had to do with they were heavily laser-focused on what they were being asked. They sent out, I think, three questions relating to please define the damages for us. There was not a mental anguish definition in the jury charge originally or the court's instructions originally. And so they said, can you help us and give us a definition? And by agreement in the parties they did. They also asked about what does disfigurement mean? They asked about physical impairment. So they were very focused on getting this right. They deliberated over two days. There were three questions, but they had more subparts. But this was a very conscientious jury, a kind of jury you want that does want instruction. So I don't think it was the result of passion or prejudice. And as a number of cases note, different juries evaluate these very subjective injuries in different ways. And I think, I know there's the comment about, well, the disfigurement, they didn't award any damages for future disfigurement. So they were applying a reasoned analysis of the questions and, you know, I think they were trying to answer them to the best of their ability being extremely conscientious. Remind us how these numbers compare to what was argued by plaintiffs or defense counsel in their closing arguments. I think in the closing arguments no damages amounts were, no specific damages amounts were In terms of bicep tear, I think that it's just speculation about whether these other injuries, these other cases involved bicep tears. But I still think that really it needs to be viewed in the larger picture of what kind of, what as opposed to some of these more picky details because there was very strong evidence in the record of her pain and her disability. Her caretaker testified and she testified that the pain was just excruciating, that this was a woman who was used to pain. She had this degenerative spinal injury. So she was shoulder injury, the rotator, but turned out to be a full thickness rotator cuff tear, took the pain to a whole new level. Both Ms. Fulton and the Ms. Tamargo, the caretaker, said they couldn't even describe how intense this pain was. Another, another indicator of how traumatic that this was for her is that Ms. Tamargo saw her right before she left and helped her get on, go to the airport and saw her right when she came back. And she was immediately saw that something terrible had happened. It was like a different person had come. And she's noted that, that Ms. Fulton had worked very hard to be as strong as she could be and healthy as she could be. So she could be as independent as she could be. And all that was basically taken away from her by this accident. Now she, Ms. Tamargo described her as having been emotionally devastated by everything that happened to her. And another indication of how painful this all was with the only reason to get this surgery is, or the main reason to get it and her pain was so great that she went to, and it's not easy for her to do things like this. She went to all the trouble to get the surgery. She had to go through a number of doctors who are basically saying, oh, don't bother us with this. It's just your back. And then she finally found one that took her seriously and it turned out he was right. Even their own expert had to admit that he was right about it being a full thickness rotator cuff tear. Now he did not agree with Dr. Watson more generally. So, and to get this, she had to, then one of the reasons why it occurred seven months later, was she had to go through all kinds of, all kinds, having therapy, getting the money arranged, finding doctors. And also, I also don't want to omit that Dr. Watson testified that she will need additional rotator cuff surgery in all, in all reasonable medical probability. And that's because, partly because of how much she has to use her arms, because of, she just only moves around and navigates by wheelchair. And also that he said rotator cuff surgeries generally don't last forever and they basically wear out over time. So, and we ask that the court affirm the judgment. Thank you very much. I'll make a few quick points. Judge Elrod, you asked, you asked about closing argument. No specific amounts were listed for the jury during closing argument by plaintiff. There was an ELMO. The record, the transcript shows in brackets that the numbers were being written, something was being written on the ELMO. It just says, open parentheses, indicating several places during closing argument. When Fulton's counsel is talking about how much ought to be submitted to the jury. That's the same passage in which the, send a message to the corporation. And if you want the message to the corporation to go high, to this person, to this person, to this person, that the amount you award needs to be several, you know, a multiplier of the amount that's otherwise necessary to fairly compensate her. So, you know, that, that's what was said in closing to your question about that. In pretrial conference, which was, I guess, the Friday before the trial started on Monday, Judge Hittner did ask plaintiff's counsel, what are you seeking here? And plaintiff's counsel responded, I'm trying to get 80,000 in medicals and $500,000. So that is what he described as, I guess, his best day as you were headed into trial. And, you know, I guess it gives me some pause about whether her compensatory damages are somehow more than six and a half times sort of the best day between the final pretrial conference and closing argument. I want to talk, answer the question. There were some questions about the, all the evidence about loss of enjoyment of life. That issue, diminished physical capacity, not being back up to 100% and loss of enjoyment of life. And there was a lot of testimony about that. That all goes under physical impairment. There's a footnote in Longoria opinion out of this court from 2019 that confirms that that's the case under Texas law as well. And the problem here there's with Watson's testimony, if I could shift to that for a second, it's twofold. There's our causation challenge, but there's the problem that the jury was left with sort of insufficient guidance about how to determine, you know, what her level of physical pain and mental anguish is. And that's the biggest portion of that non-economic damage award. It's the $3 million between the past and the future. And, you know, that's ends up not being, his testimony ends up not being enough under Texas law. And that's why that, you know, is important in this case. I want to just... Is it legitimate for the jury to have considered a future surgery in its damage award? Absolutely. That goes into the future damages awards and it goes into, you know, you know, the pain and mental anguish from having to do that would go into that $3 million. It was $1 million for future. The inconvenience and diminishment goes under the physical impairment. Any disfigurement they didn't award for future there. And then there's a separate future award for future medicals. There's an instruction to not overlap, to not award damages in more than one category that was also given to the jury as part of the answer jury note number two. So I guess my last point really kind of has to do with the caution that we ought to use about picking sort of an outlier or picking cases that aren't quite factually similar. I do think that the maximum recovery rule allows for a court to make some calibrations and some adjustment once it finds a case that involves a factually similar injury. And again, I just thought I would leave the court with just a couple of reflections from Judge G in his opinion in USP. We about the exercise of judgment when you're reassessing a damage award. Of course, it's subjective, but it involves the    of experience, emotions and calculation, all within an objective frame of reference, damage awards and similar cases. And so to avoid the danger of sort of this arithmetic progression of $1.5 million, this $3.8 million award stands the new benchmark. The next such case ends up being $5.7 million, the next one $8.5 million. I think that pushes us to be very cautious and cautious about the benchmarks. Thank you. We have your arguments. We appreciate y'all both appearing by Zoom today so we could hear from you in your case and the cases submitted. Thank you.